**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 14-CR-163 (CKK)** |
| **v.** | GOVERNMENT MOTION TO ADMIT OTHER CRIMES EVIDENCE AT TRIAL |
| **JULIAN RODRIGUEZ RIOS,** **aka "Gotcha"** | |
| **Defendant.** | |

**GOVERNMENT'S MOTION IN LIMINE TO INTRODUCE**
**OTHER CRIMES EVIDENCE AT TRIAL**

The United States of America, by and through counsel, respectfully moves this Court to admit evidence of other crimes as direct evidence of the multi-year, multi-member, complex international narcotics trafficking conspiracy, as being intrinsic or intrinsically intertwined with the charged conspiracy, or, in the alternative, pursuant to Federal Rule of Evidence 404(b). The Government seeks to admit: (1) evidence of a Baltimore, Maryland drug trafficking organization, (2) evidence of a Pittsburg, Pennsylvania drug trafficking organization, (3) evidence of a Bronx, New York drug trafficking organization that resulted in a search warrant, (4) evidence of the origin of money from a July 9, 2014 money pickup in Bronx, New York; and (5) evidence of a 833,000 Euro seizure in Madrid, Spain on November 27, 2014.

**I.     The Instant Offense**

On July 29, 2014, a federal grand jury returned an Indictment against the Defendant Julian RODRIGUEZ-RIOS, also known as "Gotcha" (hereinafter "RODRIGUEZ-RIOS" or

1

"Defendant") charging that, from in or around April 2009 and continuing thereafter up to and including July 2014, the Defendant conspired to conduct financial transactions-the transfer of funds and deposits of United States currency into bank accounts-which involved the proceeds of specified unlawful activity, to wit: narcotics trafficking, knowing that the property involved in the financial transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership and control of such proceeds, in violation of violation of Title 18, United States Code, Sections 1956(a)(l)(B)(i), 1956(h).  The indictment also contains a forfeiture allegation, citing Title United States Code, Section 982, and Title 21, United States Code, Section 853.

The Government intends to prove at trial that during the course and in furtherance of the charged conspiracy several drug trafficking organizations (hereinafter "DTO") used the Defendant as a Black Market Peso Exchange (hereinafter "BMPE")[1] money broker to launder narcotics proceeds from the United States (hereinafter "U.S.") and elsewhere to Colombia. Some, if not all of the money that the Defendant exchanged on the BMPE was comprised of narcotics proceeds.  In order to conceal the nature, location, source, ownership and/or control of the funds and enter them into the banking system, the DTO's used the Defendant's services.  The Defendant and the DTO's arranged for the bulk cash to be picked-up on the streets and transferred to the Defendant's representative in a covert manner.  The transaction was designed in whole or in part to conceal the nature, location, source, ownership and/or control of the funds. These transactions took place covertly, with the participants using coded language to coordinate the money pickups and transfers, often in different locations for each pickup.  The cash was often

---

[1]     The BMPE provides various national currencies to individuals and markets in order to circumvent banking regulations, income reporting requirements, and other legal regulations that exist in various countries.

in mixed denominations and its packaging varied from shrink-wrapped packages to loose cash in buckets.

Further, to conceal the nature, location, source, ownership and/or control of the funds, the drug traffickers did not directly deposit the narcotics proceeds into the U.S. banking system. U.S. bank reporting requirements are triggered when funds in excess of $10,000 or more are deposited into U.S. financial institutions.  Instead, the DTO's used the services of the Defendant, who in turn sought the assistance of individuals in the U.S. who were able to deposit large sums of money into a U.S. bank account, where the funds were transferred to bank accounts around the world that were designated by the Defendant or his associates.

Much of the money transmitted or seized by Homeland Security Investigations (hereinafter "HSI") in this case contained residue that tested positive for narcotics.  The Government intends to offer evidence that the Defendant was involved in handling the drug proceeds from multiple DTO's, and such evidence is intrinsic to the money laundering offense with which the Defendant is charged, or, in the alternative, is evidence of a common scheme or plan, intent, and/or knowledge pursuant to Federal Rule of Evidence 404(b).

II.     **The Proposed Evidence**

A.      Evidence of Baltimore, Maryland DTO

At trial, the Government intends to introduce evidence, through law enforcement testimony, of the Defendant's connection to a DTO in Baltimore, Maryland.  Specifically, the Government anticipates introducing evidence at trial about a DTO that was located in Baltimore, Maryland and was led by "DP" and "RS."   The evidence would show through recorded conversations, testimony from undercover agents (hereinafter "UC") and confidential sources (hereinafter "CS"), and forensic laboratory results that this DTO sold narcotics in and around

Maryland and used the services of the Defendant to launder its money.  Specifically, on February 3, 2014, Special Agent Herrera received information that the Defendant had contacted a CS about accepting a contract to pick up money from RS in Baltimore, Maryland.  The CS accepted the contract and passed RS's number to an UC and instructed the UC to contact RS.  During the conversation with the UC, RS indicated how his DTO operated and had the UC speak with RS's associate, who was located in Mexico.  They discussed the DTO's operation in Maryland and the pickup of $135,000 in U.S. currency.  The evidence will also show that on March 31, 2014, RS traveled to New Jersey.  On the return trip to Maryland, law enforcement searched his car and found packages of cocaine.

   B.   Evidence of Pittsburg, Pennsylvania DTO

   At trial, the Government intends to introduce evidence through law enforcement testimony of the Defendant's connection to a DTO in Pittsburg, Pennsylvania.  Specifically, the Government anticipates introducing evidence at trial about a DTO that was located in Pittsburg, Pennsylvania and was led by "AB."  The evidence would show through testimony from UC's, CS's, a cooperating witness, forensic laboratory results, and ledgers that the "AB" DTO acquired and distributed heroin in and around Pennsylvania.  The cooperating witness will testify that he/she packaged and distributed heroin for AB and used the services of the Defendant to launder its money.  Specifically, on January 9, 2014 and February 12, 2014, witnesses will testify about two separate money pickups which the Defendant arranged.  The evidence will also show that on January 9, 2014, Beatty or a co-conspirator drove a gold Acura to deliver the money and that on March 20, 2014, agents observed the same gold Acura in the area.  On the same day, agents executed a search warrant and recovered heroin from a trap in the car.

C.      Evidence of a Bronx, New York search warrant

At trial, the Government intends to introduce evidence through law enforcement testimony of the Defendant's connection to a residence in Bronx, New York where a search warrant was executed.  Specifically, the Government anticipates introducing evidence at trial about a search warrant that was executed as a result of earlier money pickups that the Defendant arranged on July 14, 2014 and July 28, 2014.   The evidence would show through BBM's, testimony from UC's and CS's, recorded conversations, and forensic laboratory results that this DTO used the services of the Defendant to launder its money.  Specifically, the Defendant contacted the CS about accepting a contract to pick up $230,000 in U.S. currency from a male individual on July 14, 2014 and to pick up another sum of money on July 28, 2014 in Bronx, New York.  For the pickup on July 28th, "R" retrieved the money from a building on 181st Street and Grand Concourse and HSI received a warrant to search R's apartment.  In the apartment, police recovered numerous items including but not limited to; a heat sealer, bags with residue, a kilogram drug press, a gun, empty bags, rubber bands, and bundles of money with rubber bands approximately $600,000 in U.S. currency.

D.  Evidence of origin of money from the July 9, 2014 pickup

At trial, the Government intends to introduce evidence through law enforcement testimony and a cooperating witness about a money pickup that the Defendant arranged in Bronx, New York on July 9, 2014.  The evidence would show through BBMs, audio recordings, and testimony from a cooperating witness that this DTO used the services of the Defendant to launder its money.  Specifically, the Defendant had contacted CS about accepting a contract to pick up money from "AF."  The CS accepted the contract and passed AF's number to an UC and instructed him to contact AF.  AF then attempted to deliver the money to an undercover officer,

and law enforcement seized approximately $201,000 in U.S. currency.   The evidence would also show that after this seizure, a cooperating witness traveled to the Dominican Republic in August 2014 to explain about the seizure and divert responsibility for its loss.   In the Dominican Republic, the cooperating witness spoke to the Dominican point of contact, and the cooperating witness learned the identity of the person who owned the seized money.   In subsequent conversations on later occasions, the cooperating witness learned that the owner of the money was a drug trafficker.

E. <u>Evidence of a Money Pickup in Madrid, Spain on November 27, 2014</u>

At trial, the Government intends to introduce evidence through law enforcement testimony and a CS about a money pickup that the Defendant arranged in Madrid, Spain, on November 27, 2014.  The evidence would show through BBMs, audio recordings, and testimony from law enforcement and a CS that the Defendant used the services of the CS to pickup approximately 833,000 Euros in Madrid, Spain, which were then to be laundered through a financial institution in New York.  Specifically, on or about November 4, 2014, the Defendant contacted CS about accepting a contract to pick up money in Madrid.  Acting under the direction of law enforcement, the CS accepted the contract, and on November 27, 2014, an undercover officer accepted delivery in Madrid of two suitcases filled with approximately 833,000 Euros.[2] In a series of consensually recorded conversations with the defendant, the CS denied picking up the money, and the Defendant and a co-conspirator then threatened the CS.[3]  Spanish authorities deposited the money and transferred it to an undercover bank account in New York that was controlled by law enforcement.

---

[2]    This is the equivalent of approximately $966,000 in U.S. dollars.
[3]    The co-conspirator was an associate from whom the Defendant obtained the Madrid contract.

### III.     Argument

A.     The Proposed Evidence Is an Intrinsic Part of, and Inextricably Intertwined with, the Charged Conspiracy and Is Direct Evidence of that Conspiracy

Rule 404(b) of the Federal Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

> Fed. R. Evid. 404(b) (2011).

Rule 404(b) "excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'"  United States v. Allen, 960 F.2d 1055, 1058 (D.C. Cir.), cert. denied, 506 U.S. 881 (1992); see also United States v. Gartmon, 146 F.3d 1015, 1020 (D.C. Cir. 1998) (holding evidence that the defendant charged with fraud had threatened a co-conspirator was not "other crimes evidence" but instead "inextricably intertwined" with charged offense).

The Court of Appeals adopted defining intrinsic "other crimes" evidence this way:

> Evidence of criminal activity other than the charged offense is not considered extrinsic if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or it is necessary to complete the story of the crime of trial . . .

United States v. Badru, 97 F.3d 1471, 1474 (D.D.C. 1996), cert. denied, 520 U.S. 1150 (1997) ((citing United States v. Weeks, 716 F.2d 830, 832 (11th Cir. 1983)).

Intrinsic evidence is admissible as direct evidence of the crimes charged and not subject to analysis under Federal Rule of Evidence 404(b).  Because intrinsic evidence, "by its very

nature, does not involve *other* crimes, wrongs or bad acts…there is no concern that it might be used as improper character evidence," and therefore, Rule 404(b) does not apply.  United States v. Lerma-Plata, 919 F. Supp. 2d 152, 156 (D.C. Cir. 2013).

As a practical matter, "[w]hen evidence is 'inextricably intertwined' with the charged crime [or intrinsic], courts typically treat it as the same crime," United States v. Bowie, 232 F.3d 923, 928 (D.C. Cir. 2000)(acknowledging the difficulty in defining the phrase "inextricably intertwined"), and admit such evidence.  The D.C. Circuit has explicitly recognized "that evidence can be intrinsic to the crimes charged." United States v. Sitzmann, 856 F.Supp.2d 55, 59 (D.D.C 2012).  According to the Bowie court, "(at least) two types of evidence may be properly considered 'intrinsic,' that is, not subject to Rule 404(b): (1) evidence 'of an act that is part of the charged offense'; and (2) evidence of 'some uncharged acts performed contemporaneously with the charged crime…[that] facilitate the commission of the charged crime.'" Lerma-Plata, 919 F. Supp. 2d at 156 (quoting Bowie, 232 F.3d at 929).

The D.C. Circuit also acknowledged that there are even "several forms of 'other crimes' evidence…[that] are not considered extrinsic within the meaning of Rule 404(b)." Badru, 97 F.3d at 1474.  For instance, evidence of uncharged crimes may be intrinsic if it "arose out of the same series of transactions as the charged offense…or it is necessary to complete the story of the crime on trial." Weeks, 716 F.2d at 832; but see Bowie, 232 F.3d at 928-29 (noting that arguably, all relevant prosecution evidence "completes the story" under Rule 404(b)).  Thus, "[a]s long as evidence of the uncharged criminal conduct is offered as direct evidence of a fact in issue and not as circumstantial evidence of the character of the accused, it is admissible independent of its superficial similarity to that which would be considered evidence of 'other crimes' under Rule 404(b)." United States v. Gray, 292 F. Supp. 2d 71, 77-78 (D.D.C. 2003)

(citing <u>Badru</u>, 97 F.3d at 1475) (citing 22 Charles A. Wright and Kenneth W. Graham, Jr., Federal Practice and Procedure § 5239, at 450 (1978)).

1. **Evidence of narcotic trafficking and a money pickup on November 27, 2014**

The Government intends to introduce evidence that the Defendant and co-conspirators were involved in drug trafficking, therefore, evidence of the DTO's in Pittsburg and Baltimore, the search warrant in the Bronx, testimony about the origin of the money from the July 9, 2014 pickup, and a money pickup in Madrid, Spain on November 27, 2014 that was in furtherance of the conspiracy and direct evidence of the charged conspiracy. These actions reveal that the Defendant conspired with others to launder proceeds of specified unlawful activity, to wit; narcotic trafficking. This type of evidence is inextricably intertwined with the charged money laundering conspiracy as the statute requires that the laundered funds are the result of specified unlawful activity. While the Defendant may argue that the connection between the money pickups and the DTO's and subsequent seizures are too attenuated, each event should not be considered in isolation as the crime of narcotic trafficking necessitated the commission of the charged money laundering. Specifically, D.C. courts have previously found that an "alleged conspiracy to launder money…is properly intrinsic to the charged drug conspiracy as contemporaneous acts that facilitated the commission of the charged offense." <u>Lerma-Plata</u>, 919 F. Supp. 2d at 158. Here, the proposed evidence involves acts of narcotic trafficking and are inextricably intertwined with the manner and means used by the Defendant to carry out the charged money laundering conspiracy. The financing of drug transactions and the movement of money – according to the Court in <u>Lerma-Plata</u>, 919 F. Supp. 2d at 158, "the very nuts-and-bolts of any drug trafficking operation" – are "contemporaneous conduct designed to facilitate and

advance the goals of [the organization and] the charged conspiracy," and are additionally part and parcel to the crime charged.  Id.  Such steps that facilitate the commission of the charged crimes are acts conducted in furtherance and during the money laundering conspiracy, and are vital to its survival.

Moreover, evidence of the activities of the other DTOs is contemporaneous with the Defendant's operation and involvement in the BMPE, and the requested testimony and evidence defines the structure of the conspiracy.  Removing this evidence, or portions of it, would not portray an accurate picture of the manner and means by which the Defendant carried out the money laundering conspiracy and would not paint an accurate picture of the Defendant and/or co-conspirators' involvement.  The "story" would be "incomplete."  See Weeks, 716 F.2d at 832. The nature, scope, and time frame of the above events establish that the funds were part of the specified unlawful activity and part of the Defendant's criminal activities.  This evidence is not being used to show the Defendant's character or action in conformity and would be used for a legitimate purpose; to show the unlawful source of the money.  See United States v. Lorenzana-Cordon, 141 F. Supp. 3d 35, 39 (D.D.C. 2015)(holding that evidence of the defendants' money laundering efforts during alleged conspiracy was intrinsic to charge of conspiracy to import cocaine and not for propensity purposes and was admissible).  Thus, evidence of the DTO's in Pittsburg and Baltimore, the search warrant in the Bronx, testimony about the origin of the money from July 9, 2014 pickup, and a money pickup in Madrid, Spain on November 27, 2014 is inextricably intertwined with the evidence regarding the charged conspiracy and are related criminal acts that facilitated the charged conspiracy.

Then too, evidence of the money pickup in Madrid, Spain, is also intrinsic to the conspiracy.  Although the indictment was returned on July 29, 2014, the conspiracy did not end

10

on that date.  See United States v. Sitzmann, 74 F. Supp. 3d 96, 106 (DDC 2014)(noting that "[c]onspiracy is an ongoing offense that lasts, absent one's affirmative withdrawal from the enterprise, as long as any co-conspirator continues to further common ends[.]")(quoting United States v. Childress, 58 F.3d 693, 733, 313 U.S. App. D.C. 133 (D.C. Cir. 1995)).  To the contrary, the Defendant and his co-conspirators continued to engage in money laundering up to and beyond the period of the Madrid money pickup.

Furthermore, the Madrid seizure should be admissible because conduct after the period of the charged conduct may be considered "intrinsic" to the offense.  For instance, in United States v. Bajoghli, 785 F.3d 957, 965 (4th Cir. 2015), in a case involving health care fraud, the Court found that conduct occurring after the alleged scheme had concluded was intrinsic to the charged offense.  In so finding, the Court held that it:

> "simply does not follow that conduct that takes place after the end of the period of activity charged in the indictment is -- as a matter of law -- subject to the requirements of Rule 404(b).  In fact, our case law demonstrates that simply because a defendant's conduct takes place outside the time frame of the activities charged in the indictment does not, as Bajoghli argues, automatically render that conduct extrinsic to the charged offense and therefore subject to Rule 404(b)."

Bajoghli, 785 F.3d 965.

Similarly, in the instant case, the Madrid seizure was part of the on-going conspiracy. The Defendant continued his course of conduct with a co-conspirator in arranging for bulk cash pickups that were intended to be laundered through a U.S. bank account for the purpose in whole or in part of concealing the nature, location, source, ownership and/or control of the funds. Evidence of the Madrid seizure, though outside the timeframe of the charged conspiracy, should be admitted as intrinsic to the offense, because the conspiracy continued even after the time period when the grand jury returned the indictment.

11

B.  Evidence of Acts that are not an Intrinsic Part of or Inextricably Intertwined with a
    Charged Crime Are Admissible in the Alternative as 404(b) Evidence

In the event that the Court finds that the evidence of other DTO's is not an intrinsic part

or inextricably intertwined with the charged conspiracy, the Government moves, alternatively, to

admit the evidence pursuant to Federal Rule of Evidence 404(b).  Rule 404(b) permits the

admission of "evidence of other crimes, wrongs, or acts" to prove a material issue other than

character, such as "motive, opportunity, intent, preparation, plan, knowledge, identity and

absence of mistake or accident."  Fed. R. Evid. 404(b).  "Under the law of this circuit, 'Rule

404(b) is a rule of inclusion rather than exclusion'…and it is 'quite permissive,' excluding

evidence only if it is offered for the sole purpose of proving that a person's actions conformed to

his or her character."  United States v. Long, 328 F.3d 655, 660-61 (D.C. Cir. 2003) (quoting

Bowie, 232 F.3d at 923) (citations and quotations omitted).  The Rule lists several permissible

purposes of other crimes – e.g. to prove "motive, opportunity, intent, preparation, plan,

knowledge, identity and absence of mistake or accident;" however, this list is "not exhaustive."

United States v. Miller, 895 F.2d 1431, 1435 (D.C. Cir. 1990).  "[T]he Government need not

show that the evidence is being offered for one of the purposes specifically enumerated in the

rule," Lerma-Plata, 919 F. Supp. 2d at 155.  As the D.C. Circuit noted, "in some cases

'[e]xtrinsic acts evidence may be critical…especially when th[e] issue involves the actor's state

of mind and the only means of ascertaining that mental state is by drawing inferences from

conduct."  United States v. Brown, 597 F.3d 399, 404 (D.C. Cir. 2009) (quoting Huddleston v.

United States, 485 U.S. 681, 685 (1988)).  Even a collateral showing of character is insufficient

to bar the evidence.  "True, the evidence may tend to show that [the defendant] is a person of bad

character, but Rule 404(b) does not thereby render it inadmissible…under Rule 404[b], '*any*

purpose for which bad acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character.'" United States v. Cassell, 292 F.3d 788, 795 (D.C. Cir. 2002) (quoting Miller, 895 F.2d at 1436) (emphasis added).

This Circuit has accepted a two-pronged test for determining whether evidence of prior crimes is admissible under 404(b).[4]  First, the evidence must be "probative of a material issue other than character."  See Miller, 895 F.2d at 1435 (quoting Huddleston, 485 U.S. at 686)). Second, the evidence is subject to the balancing test of Federal Rule of Evidence 403, so that it is inadmissible only if the prejudicial effect, or to a lesser extent the effect of any other Rule 403 consideration under Rule 403, of admitting the evidence substantially outweighs its probative value. See id.  Even so, these considerations "[g]enerally…do not flatly prohibit the introduction of such evidence but instead limit the purpose for which it may be introduced."  Huddleston, 485 U.S. at 687.

In assessing the relevance of other acts evidence under the first prong, the court "neither weighs credibility nor makes a finding that the Government has proved the conditional fact by a preponderance of the evidence.  The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact…by a preponderance of the evidence."  Huddleston, 485 U.S. at 690.  As to the probative value of such evidence, the court should consider "the similarity of the bad act with the charged offense, the time separating the two events, and the prosecution's need for the evidence."  United States v. Lavelle, 751 F.2d

---

[4]      The Miller Court notes that "[t]his two-step analysis—certification of a 'proper' and relevant purpose under Rule 404(b), followed by the weighing of probity and prejudice under Rule 403—is firmly rooted in the law of this circuit. See, e.g., United States v. Manner, 887 F.2d 317, 321 (D.C. Cir.1989), cert. denied 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990); United States v. Lavelle, 751 F.2d 1266, 1275 (D.C. Cir.), cert. denied, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985)." Miller, 895 F.2d at 1435.

1266, 1277 (D.C. Cir.), cert. denied, 474 U.S. 817 (1985) (citations and footnote omitted), abrogated on other grounds by Huddleston, 485 U.S. at 687, n. 5.

As to the second prong, "the relevant inquiry…is whether the probative value of evidence is 'substantially outweighed' by a danger of unfair prejudice." Lerma-Plata, 919 F. Supp. 2d at 159. This Circuit has noted that it is not enough that the evidence is simply prejudicial; the prejudice must be "unfair." See Cassell, 292 F.3d at 796 (quoting Dollar v. Long Mf'g, N.C., Inc., 561 F.2d 613, 618 (5th Cir. 1977) ("Virtually all evidence is prejudicial or it isn't material. The prejudice must be unfair"); Sitzmann, 856 F.Supp.2d at 61-62 ("the test under Rule 403 is 'unfair prejudice,' not just any prejudice or harm to the defense.")) For evidence to be unfairly prejudicial within the meaning of the Rule, it must have "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" Old Chief v. United States, 519 U.S. 172, 180 (1997) (quoting Advisory Committee Notes on Fed. R. Evid. 403).

Furthermore, Rule 403 strongly favors admission of 404(b) evidence. "Rule 403 tilts, as do the rules as a whole, toward the admission of evidence in close cases, even when other crimes evidence is involved." United States v. Douglas, 482 F.3d 591, 600 (D.C. Cir. 2007) (citing Cassell, 292 F.3d at 795) (internal quotation marks omitted). "In determining whether 'the probative value is substantially outweighed by the danger of unfair prejudice' it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged." United States v. Harrison, 679 F.2d 942, 948 (D.C. Cir. 1982) (quoting United States v. Day, 591 F.2d 861, 878 (D.C. Cir. 1978)).

The D.C. Circuit has consistently minimized the risk of potential prejudice not by exclusion, but by issuing limiting instructions to the jury. See, e.g., Cassell, 292 F.3d at 796

14

(emphasizing the significance of the district court's instructions to jury to "consider the evidence for the limited and proper purposes"); Douglas, 482 F.3d at 601 (same); Pettiford, 517 F.3d at 590 (same); United States v. Crowder, 141 F.3d 1202, 1210 (D.C. Cir. 1998) (en banc) (Crowder II) (stating that mitigating instructions to jury enter into the Rule 403 balancing analysis); United States v. Mitchell, 49 F.3d 769 (D.C. Cir. 1995) (stating that limiting instructions concerning other crimes evidence may guard against improper inferences). "[I]t is the law, pure and simple, that jury instructions can sufficiently protect a defendant's interest in being free from undue prejudice." United States v. Perholtz, 842 F.2d 343, 361 (D.C. Cir.), cert. denied, 488 U.S. 821 (1988) (citation omitted).

### 1. Evidence of Similar Prior Drug Trafficking Organizations

Evidence of the DTO's in Pittsburg and Baltimore, the search warrant in the Bronx, testimony about the origin of the money from July 9, 2014 pickup, and the evidence of the Madrid money pickup, should be admitted as evidence of a common scheme or plan, intent and knowledge pursuant to Federal Rule of Evidence 404(b) because it is probative of a material issue other than character and its probative value outweighs any prejudicial effect. See Miller, 895 F.2d at 1435. Here, the Government's proposed evidence would show that the Defendant was involved with multiple DTOs in which he worked with co-conspirators to launder their money. The DTOs in Baltimore, Pittsburg, and the Bronx generated narcotic proceeds and required an exchange system that allowed them to continue business without law enforcement interference. The Defendant was the money broker with connections and accounts in financial institutions on both sides of the border and when the DTOs used the Defendant it was simply a matter of business. This evidence shows that the Defendant and these DTOs had a symbiotic relationship and shared the same common scheme or plan to sell narcotics, launder the funds,

and start again.  This is relevant because courts have held that evidence of a co-conspirator's narcotics operation and a Defendant's connection to it was relevant proof of plan or scheme of the conspiracy.  See United States v. Lester, 749 F.2d 1288, 1298 (9th Cir. 1984).  Further, in United States v. Sitzmann, 856 F.Supp.2d 55, 62-63 (D.D.C. 2012), the court was persuaded that in a drug conspiracy case, probative other crimes evidence which goes to the Defendant's knowledge, intent, absence of mistake or accident, should be admitted.  See United States v. Bowie, 232 F.3d at 930 ("Intent and knowledge are ... well-established non-propensity purposes for admitting evidence of prior crimes or acts."); United States v. Mitchell, 49 F.3d 769, 775 (D.C.Cir. 1995) ("[W]e have frequently upheld the admission of evidence regarding other drug transactions as relevant to intent in a charged drug transaction.").

Similarly, evidence of the Madrid pickup and subsequent seizure demonstrates a common motive, scheme or plan.  The defendant contracted with a CS to pickup the money and deposit it in a New York bank account, where the CS would then transfer the funds to other accounts according to the Defendant's instructions.  This event, consistent with the earlier events, demonstrates a common motive, scheme or plan, and hence absence of mistake, in accepting bulk currency to deposit in a New York bank account for subsequent transfers to other bank accounts.  Accordingly, it is admissible under Rule 404(b).  See United States v. Chriss, 2009 U.S. Dist. LEXIS 83456 (W.D.LA Sept 14, 2009)(finding that evidence of fraudulent prescriptions which took place subsequent to the time of the charged conspiracy was admissible as 404(b)).

Evidence of the commission of similar crimes is also regularly admitted to prove knowledge and absence of mistake.  See, e.g., United States v. Johnson, 970 F.2d 907, 913-14 (D.C. Cir. 1992) (finding admission of two prior moneygram frauds to establish knowledge and

participation in charged moneygram fraud scheme); United States v. Brown, 597 F.3d 399, 404-405 (D.C. Cir. 2010) (upholding admission of other crimes evidence regarding recent use of fraudulent financial documents in fraud prosecution to demonstrate knowledge, motive, and absence of mistake or accident); United States v. Wilson, 31 F.3d 510, 515 (7th Cir. 1994) (admitting evidence of other drug activity because it "tend[ed] to show that [the defendant] was familiar with the cocaine business and was not some innocent bystander mistakenly caught up in an overzealous law enforcement"); United States v. Perholtz, 842 F.2d 343, 358 (D.C. Cir.) (per curiam) (holding in an appeal from convictions for several schemes to fraudulently procure U.S. Postal Service contracts, the court upheld the admission of evidence that was "highly probative of efforts to further an ongoing scheme to defraud and demonstrate[d] conscious awareness of guilt on the part of the defendants"), cert. denied, 488 U.S. 821 (1988).

Further, as the Defendant is anticipated to deny knowledge that the money he was laundering was drug proceeds, evidence that the money came from individuals directly involved in drug trafficking is crucial to the Government's case to counter such an argument.   In furtherance of his money laundering activities, the Defendant arranged for covert money pickups and transfers, with the participants using coded language in their communications and often utilizing different locations for each pickup.   However, these covert actions will not prove that these pickups are the result of unlawful activity.  Without the testimony to explain the underlying source of the money, it could be argued that the Defendant was simply involved in a legitimate currency exchange system similar to the hawala system.[5]   As such, it is imperative that the Government be able to show the source of the funds and explain that is derived from narcotics

---

[5]	Hawala is an informal value transfer system primarily located in the Middle East.

proceeds. Accordingly, this evidence should be admitted, in the alternative, as proper 404(b) evidence.

The prosecution satisfies its burden in part, under Rule 404(b), by "identifying a legitimate purpose" for which the other crimes evidence could be used. United States v. Manner, 887 F.2d 317, 321 (D.C. Cir. 1984). Here, evidence of narcotic trafficking is probative of several issues, specifically (1) the Defendant's intent to make profits from illegal activity; (2) the Defendant's knowledge that he was engaged in an unspecified unlawful activity to wit moving proceeds from narcotic trafficking; and (3) that the Defendant shared the common plan to carry out his various intertwined money laundering and related criminal activities. Similarly, evidence of the Madrid seizure is admissible to show a common motive, scheme or plan; intent; and absence of mistake.

Moreover, the D.C. Circuit has long-held that crimes that involve a conspiracy charge "increase the probativeness of Rule 404(b) evidence." Manner, 887 F.2d at 322 (citing to United States v. Sampol, 636 F.2d 621, 659 n. 23 (D.C. Cir. 1980)). See Mathis, 216 F.3d at 26 ("In a conspiracy prosecution, the Government is usually allowed considerable leeway in offering evidence of other offenses to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to explain to the jury how the illegal relationship between the participants in the crime developed") (internal quotation marks and citation omitted).

C. The Proposed Evidence is Not Prejudicial under Rule 404(b)

Lastly with respect to Rule 404(b), all aforementioned evidence should be admissible because the probative value of the evidence substantially outweighs any prejudicial effect to the Defendant on three separate grounds. The danger that this Court must weigh is not the danger

that the other crimes evidence will weaken the Defendant's defense, but rather the danger that the jury will misuse the evidence by inferring that, merely because the Defendant engaged in these prior bad acts, he was prone to commit the crime charged.  See United States v. Mitchell, 49 F.3d 769, 777 (D.C. Cir.), cert. denied, 516 U.S. 926 (1995).  The law in this Circuit is clear that in balancing the probativeness and prejudice of other crimes, "it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged."  United States v. Harrison, 679 F.2d 942, 948 (D.C. Cir. 1982) (quoting United States v. Day, 591 F.2d 861, 878 (D.C. Cir. 1978)).

First, the evidence, "by its very nature, could not lead to a fair inference that Defendant is 'prone' to commit the crime charges because the evidence…[is in itself] to be part and parcel to the crime charged."  Lerma-Plata, 919 F. Supp. 2d at 160.  Second and to reiterate from above, should the Court find that the evidence is not "part and parcel to the crime, "it is a sound rule that the balance should generally be struck in favor of admission,"  Harrison, 679 F.2d at 948 (quoting Day, 591 F.2d at 878), when the evidence, as it does here, indicates a close relationship to the event charged.  Third, the extent of any prejudice, or the potential misuse of such evidence by the jury, will effectively be eliminated by curative instructions by the Court before or immediately after the introduction of this evidence at trial and during the final instructions to the jury.  Thus, for the foregoing reasons, all evidence is not unduly prejudicial.

Additionally, it is anticipated that some of the proposed evidence will be introduced at trial through cooperating witnesses who were co-conspirators with the Defendant.  It is common practice for courts to admit provisionally evidence of co-conspirator statements made during and in furtherance of the conspiracy, under Rule 801(d)(2)(E).  The Government anticipates that, both on direct examination and cross examination, testimony will be elicited from these

cooperating witnesses as to "bad acts" committed by the cooperating witnesses themselves as well as other members of this conspiracy – namely, narcotic trafficking.   This testimony is anticipated due to the integral nature these "bad acts" played in the functioning of the charged conspiracy.   Indeed, as discussed above, the narcotic trafficking are all part and parcel of how the defendant operated successfully.   As such, evidence of the Defendant's involvement in these "bad acts" would not be unduly prejudicial as the Defendant was engaged in, not to mention lead and directed, at least during part of the conspiracy, the same activity with these co-conspirators. Accordingly, the evidence should be admitted at trial.

**IV.     Conclusion**

For the foregoing reasons, in accordance with the governing and long-standing practice in this jurisdiction, the Government respectfully moves, that the Court admit the proposed evidence that is inextricably intertwined with the charged conspiracy, or in the alternative, for admission of the aforementioned evidence consistent with Federal Rules of Evidence 404(b).

Respectfully Submitted,

ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice

By:     */s/ Emily Cohen*

Emily Cohen
Stephen Sola
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division,
United States Department of Justice
145 N Street, NE
East Wing, Second Floor
Washington, D.C. 20530
Tel: 202-514-0917
Emily.Cohen@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent via the CM/ECF system, to counsel of record for the defendants, this 15th day of March 2017.

/s/ Emily Cohen
Emily Cohen
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
Department of Justice
